IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 1, 2022

## STATE OF TENNESSEE v. STANLEY ALLEN

**Appeal from the Criminal Court for Shelby County**
No. 17-00862      **Chris Craft, Judge**

_____

**No. W2021-00673-CCA-R3-CD**

_____

The Shelby County Grand Jury issued an indictment charging Defendant, Stanley Allen, with aggravated statutory rape, solicitation of a minor, and sexual battery. Following a trial, a jury found Defendant guilty of solicitation of a minor and sexual battery. The jury was unable to reach a verdict on the charge of aggravated statutory rape. Defendant later entered a no contest plea to a lesser-included offense of assault by offensive touching on this charge. Following a sentencing hearing, the trial court imposed an effective one-year sentence suspended to three years of supervised probation, and the court denied Defendant's request for judicial diversion. On appeal, Defendant contends that the evidence was insufficient to support his conviction for sexual battery and that the trial court abused its discretion in denying judicial diversion. Discerning no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which J. ROSS DYER and JOHN W. CAMPBELL, SR., JJ., joined.

Phyllis L. Aluko, District Public Defender; Barry W. Kuhn, Assistant District Public Defender (on appeal); and Theresa Childress and Beth Brooks (at trial), Memphis, Tennessee, for the appellant, Stanley Allen.

Herbert H. Slatery III, Attorney General and Reporter; Kayleigh Butterfield, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Gavin Smith, and Jose Leon, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

### *Trial*

At trial, Kiara Stanfield testified that, on the weekend of June 19, 2016, she and the victim, her fifteen-year-old sister, stayed at the east Memphis apartment of Ms. Stanfield's cousin, Tatyana Donegan. Ms. Stanfield said that it was the victim's first time staying over at the apartment although Ms. Stanfield had stayed there several times over the years. Ms. Stanfield explained that she and the victim had attended a baby shower that weekend for Ms. Donegan and Ms. Donegan's fiancé, Defendant. Ms. Stanfield recalled that, while at the shower, she noticed Defendant watching the victim and that Defendant asked her several times about the victim's name and age.

Ms. Stanfield testified that, following the baby shower, Ms. Stanfield and the victim went to the apartment shared by Ms. Donegan, Defendant, and their eight-year-old son, Sean. Ms. Stanfield had agreed to babysit Sean for the night so that Ms. Donegan and Defendant could go to a late movie. Ms. Stanfield testified that she, the victim, and Sean were downstairs watching television and playing music but that she received a phone call and went upstairs to Sean's bedroom. She said that, after her call, she fell asleep on Sean's bed. When Ms. Stanfield woke up the following morning, the victim was asleep on the floor at the end of the bed. Ms. Stanfield said that she did not know when the victim entered the room although she recalled hearing the victim "calling [her] name" at one point. Ms. Stanfield stated, "I asked [the victim] what was it, but she never said nothing, so I just went back to sleep." She said that the victim had a pillow and two blankets with her on the floor. She said that the victim had "a bedwetting disorder" in June 2016.

The victim testified that, on the weekend of June 19, 2016, her mother was out of town and that she and her sister, Ms. Stanfield, planned to spend the night with Ms. Donegan and Defendant so they could attend Ms. Donegan's baby shower. The victim recalled that, on Friday, "[Ms. Donegan] came and got us from the house. We went to her mom's house. We went to [Defendant's] job, and then we went to the house." She said that they spent the night and then attended the baby shower with Ms. Donegan and Defendant on Saturday. After the shower, Ms. Donegan and Defendant asked Ms. Stanfield if she would babysit Sean while they went to a late movie. Ms. Stanfield agreed to watch Sean, and they returned to the apartment shared by Ms. Donegan and Defendant. The victim said that, while Ms. Donegan and Defendant were at the movie, she and Sean fell asleep downstairs in the living room and that Ms. Stanfield fell asleep upstairs. She said that she was still asleep downstairs when Ms. Donegan and Defendant returned to the apartment.

The victim testified, "[I]n the middle of the night, I had an accident, and I woke up, and I went upstairs to change my clothes[.]" She then lay down on the floor beside the bed where Ms. Stanfield slept. The victim stated that, before she fell asleep, Ms. Donegan entered the bedroom, opened a closet and turned on the closet light, and hung baby clothes inside. The victim said that she fell asleep but that, sometime later, Defendant entered the bedroom and turned on the closet light. Defendant gave the victim a blanket and told her that she was "going to freeze down [t]here." After covering herself with the blanket, the victim began looking at her cell phone. She said that Defendant turned off the closet light but did not leave the room. Defendant asked the victim if she was going to back to sleep and then told her to come into the hallway so that they could talk without waking Ms. Stanfield. The victim testified that this occurred around 3:00 a.m.

The victim testified that she took her pillow and a blanket out into the hallway. She said that Defendant began asking her about talking to guys on her cell phone. She said that Defendant then turned the conversation to ask if she was a virgin and that Defendant stated, "I heard virgins are freaks." The victim said that she responded, "Well, I wouldn't be able to tell you because I don't do anything." The victim said that she and Defendant also talked about music and that, at one point, he told her "quiet down" and that she was going to "get [him] in trouble up here because of [her] age." The victim stated that she told Defendant that she was fifteen. She said that, during their discussion about music, Defendant asked her what type of music she listened to when dancing. When she told Defendant the names of some artists and songs, Defendant played one of the songs on his cell phone. Defendant then grabbed her hand and pulled her up to stand with him. The victim testified that she thought Defendant was going to dance but that he sat back down and told her to dance. The victim told Defendant that she could not dance wearing the pajama pants that she had on, and Defendant asked her what she would normally wear while dancing. When she told him she would wear shorts or sweatpants, Defendant went downstairs and returned with a pair of shorts. The victim stated that, while Defendant was downstairs, she got her cell phone out of Sean's bedroom and brought it out into the hall. She said that Defendant told her to change into the shorts in front of him but that she went back into the bedroom to change.

The victim said that, after she changed, Defendant played some music and told her to dance. She continued, "So, I start to dance for a little bit, and then I stop. And then, [Defendant] gets up, and I'm assuming that he's going to dance with me, like, play around and stuff, but he actually, as I'm dancing, he comes, and he presses up against me." The victim said that she sat down and that Defendant sat down beside her. She stated:

> And [Defendant] was, like, "Do you know how to grind?" I'm, like, "No. I don't do that. I don't know how." And he asked me -- he was, like, "You don't know how to grind?" And I'm, like, "No."

- 3 -

So, he plays this song, "Grind with me." He plays this song, and he puts a pillow . . . over my face and, like, pushes me back. So, now I'm down, like, lying . . . back.

So, he puts the pillow over my face, and he moves my legs, like, opened my legs, and he starts grinding against me.

The victim said that Defendant put the pillow over her face, opened her legs, and then he started "grinding." She explained, "So, his penis [was] against my vagina . . . but we still [had] on clothes. And he's grinding against me. And then he turn[ed] me around so that . . . I'm on all fours, and he [was] grinding up against my butt[.]" When specifically asked, the victim testified that she did not open her legs but that Defendant opened her legs. The victim said that she sat down and that Defendant sat beside her and turned off the music. He then told her that she should dance for him in her underwear, but she told him no. The victim stated that Defendant went downstairs and came back up carrying a gift from the baby shower, which he set down on the stairs. She testified that Defendant then told her, "[Y]ou're going to dance for me." She said:

[S]o, . . . he plays music. I take off the shorts that I had on, and I had on underwear underneath my shorts.

So, I dance again, and he comes up behind me, and he presses hisself (sic) up against me again, and this time his hand goes up my shirt. And, at first, he's, like, touching my breast but over my sports bra, and then he puts his hand under my sports bra. So, now his hand is touching my bare breast.

. . . .

And, as I'm dancing, I feel, like, his pants come – he had on basketball shorts. And I feel them come down. And now I'm up against his under clothing.

And his hand – he's touching my vagina over my underwear at this point.

The victim testified that she moved away from Defendant and sat down beside the baby gift. Defendant then asked her to "give him head," meaning oral sex. The victim explained that, when she told Defendant no, he asked if he could perform oral sex on her but that she again said no. The victim said that Defendant turned her over "on all fours" and touched her vagina and breast again. She said that he put his hand underneath her underwear, touched her "bare vagina," and that his finger slightly penetrated her vagina.

- 4 -

Defendant said, "I want to F you, but you're going to tell[.]" The victim told Defendant no, and then Ms. Donegan called Defendant's name. The victim said that she grabbed the shorts and went back into the bedroom with Ms. Stanfield. She testified that she left her cell phone, pillow, and blanket in the hallway. She explained that, as she was lying down, Ms. Donegan entered the bedroom holding the pillow and blanket that were left in the hallway. The victim said that she asked Ms. Donegan for the items and then fell asleep.

The victim stated that Ms. Donegan woke her up the next morning. Ms. Donegan had the victim's cell phone and asked the victim why her phone was in the hallway, but the victim rolled over and tried to go back to sleep. The victim testified that, several minutes later, Defendant came into the bedroom and asked her to come into the hallway. Defendant told the victim that Ms. Donegan "asked [him] why [the victim's] stuff was in the hallway, and [he] told [Ms. Donegan] that [the victim] fell asleep in the hallway, and [he] made [the victim] get up and go in the room."

Later that day, the victim told a friend what had happened with Defendant, and her friend encouraged the victim to tell her mother. The victim said that, when she got home, she told her mom what Defendant had done and that they reported it to police several days later. She stated that they did not immediately report it because she was "overwhelm[ed]" and embarrassed and out of consideration for Ms. Donegan. She said that she provided a statement to police about the incident and then identified Defendant in a photographic lineup. The victim stated that she initially told police that there was "no penetration" because it was not explained to her what "penetration" could entail. She stated that the definition was later explained to her and that was why she testified at the preliminary hearing that there was penetration involved in the offense. When shown her statement to police, the victim agreed that she told police that Defendant had worn gray sweatpants and a t-shirt during the offense.

Alyssa Chalmers testified that she was the victim's friend and that, in June 2016, the victim told her about "[s]omething embarrassing" that had happened to the victim involving Defendant. Ms. Chalmers recalled that she and the victim exchanged text messages about the incident for about three hours and that the victim was "pretty scared," "kind of embarrassed," and "reluctant to tell [her] what happened." Ms. Chalmers said that, after the victim disclosed the incident, she told the victim to "tell her mom what happened." Ms. Chalmers agreed that she attended a birthday party for the victim several days later, but she denied that they made prank phone calls to Defendant's job.

Tenisha Polk testified that she was the victim's mother and that the victim's birthday was June 27, 2000. She said that, on June 19, 2016, she was in Biloxi, Mississippi, when she received a phone call from the victim. The victim was crying and could not talk, and Ms. Polk asked her repeatedly what was wrong. Ms. Polk told the victim that she was

going to text her, and they hung up the phone. The victim then sent Ms. Polk "a flood of . . . screenshot text messages" that showed the text messages that the victim had exchanged with Ms. Chalmers about the incident. Ms. Polk then called the victim and asked her "who," and the victim identified Defendant as the perpetrator.

Ms. Polk testified that she immediately returned home and spoke to the victim and that the victim confirmed "she was violated" by Defendant. Ms. Polk stated:

> [The victim] said that [Defendant] asked to perform oral sex on her. He asked her to perform oral sex on him. That he grabbed her breast. That he put his hand on her vagina. She told me that there was -- his finger actually touched there.
>
> . . . .
>
> The orifice, the area of the vagina. She told me he did that. That [Defendant] pushed her head -- he covered her head with a pillow and was grinding on her.

Ms. Polk said that the victim became "withdrawn" at home and spent a lot of time in her room following her disclosure. She said that she took the victim to a doctor to be examined but that they did not immediately report the offense to police because the victim said that she just wanted to "forget that it happened." Ms. Polk stated that they eventually reported it to police and that the victim attended counseling.

Lieutenant Alvin Clark testified that, in June 2016, he was an investigator with the Sex Crimes Bureau of the Memphis Police Department and that he was assigned to investigate Defendant's case. Lieutenant Clark stated that he interviewed the victim in the presence of Ms. Polk and conducted a photographic lineup, during which the victim identified Defendant as the perpetrator of the offense. He recalled that the victim appeared "embarrassed" and "hurt" by what had happened to her. Lieutenant Clark said that he next spoke to Ms. Donegan and asked her and Defendant to come in and provide a statement about the victim's allegations. Lieutenant Clark said that Ms. Donegan did not keep an initial appointment with him and that she and Defendant did not respond to his calls thereafter.

Tatyana Donegan testified that, in June 2016, she was engaged to Defendant. Ms. Donegan testified that, after her baby shower on June 18, Ms. Stanfield agreed to babysit for her and Defendant so that they could go to a movie. She stated that she and Defendant returned to their apartment after the movie around 1:00 or 1:30 a.m. on June 19. She said that she got into bed around 2:00 a.m. and that Defendant came into their bedroom and

changed into a pair of gray sweatpants and a t-shirt. Ms. Donegan said that she fell asleep and then woke up around 2:30 a.m. because she heard Defendant "fussing about somebody peeing on their self." Ms. Donegan got up and used the restroom, and Defendant came into the bedroom holding a blanket that had urine on it. Ms. Donegan said that Defendant began taking baby shower gifts upstairs and that she also went upstairs. She said that she saw a blanket lying in the hallway by the door to her son's bedroom, so she picked it up and took it into the bedroom. She said that, when she turned on the closet light, the victim asked her for the blanket, and she gave it to her. Ms. Donegan stated that, after Defendant finished taking the baby gifts upstairs, they went back downstairs to their bedroom and went to sleep. She said that, when she woke up the next morning, she found the victim's cell phone lying by the door to her son's bedroom. Ms. Donegan picked up the phone, gave it the victim, and told her that she was going to get breakfast for them. She said that she returned to the apartment around 10:00 a.m. and that she took the victim and Ms. Stanfield home around 1:30 p.m. Ms. Donegan agreed that Defendant owned basketball shorts but stated that he mainly wore sweatpants to bed. She said that she did not find any shorts or a blanket with urine on it in her son's room after the victim and Ms. Stanfield left.

On cross-examination, Ms. Donegan stated that she went back to bed between 3:30 and 4:00 a.m., after she washed the urine-soaked blanket. She agreed that she was asleep from that time until 8:00 a.m. She testified that the victim's cell phone was not in the hallway outside the bedroom door when she went upstairs at 2:30 a.m.

Defendant testified that he was born in 1984. He stated that, after the baby shower, Ms. Stanfield agreed to babysit so he and Ms. Donegan could go to the movies. He said that he and Ms. Donegan returned to their apartment around 1:30 a.m. on June 19 and that he brought in some items from the baby shower that had been left in his truck. Defendant stated that, when they returned, Ms. Stanfield was upstairs and that the victim and Sean were asleep downstairs in the living room. He said that he and Ms. Donegan got ready for bed and that he changed into some sweatpants and a white t-shirt. He said that Ms. Donegan fell asleep as he watched an interview on television. Defendant said that Ms. Donegan got up to use the restroom and that she turned down the temperature in the apartment, so he got up to get an extra blanket. Defendant said that he went into the living room to turn on their alarm and saw a blue blanket in the floor. He testified that the victim was no longer sleeping on the floor and that he stepped in urine when he picked up the blanket. Defendant said that he could smell the urine on the blanket and commented, "Somebody's too old to be pissing on themselves." Ms. Donegan heard him, and he showed her the blanket. She told him to put the blanket in the washing machine. Defendant said that he then took gifts from the baby shower upstairs and placed them in the hallway. He denied going into Sean's bedroom. He said that he was never alone with the victim, and he denied asking Ms. Stanfield about the victim at the baby shower. He denied that he

had any contact with the victim after he and Ms. Donegan returned from the movies. He said that the victim was a liar and was not telling the truth.

Defendant said that he first learned about the allegations against him later that day through a series of text messages with Ms. Polk. Defendant said that he thought it was a prank and "ignored it." Defendant stated that, about a week later, he got a prank call from the victim and her friends on his work phone. He testified, "I answered the phone. They're laughing. They're giggling. I just remember somebody saying, '[W]ho's stupid now?' I remember one of the girls screaming out, 'Payback is a B.'"

At the conclusion of proof, the State made the following election of offenses in regards to the count of sexual battery: "[A]s described by [the victim], when [] Defendant allegedly opened the victim's legs with his hands and [']grinded['] . . . on the victim, rubbing his penis on her vaginal area with a pillow over her face." Following deliberations, the jury found Defendant guilty of solicitation of a minor and sexual battery but was unable to reach a verdict on the charge of aggravated statutory rape. Prior to sentencing, Defendant entered a no contest plea to assault by offensive touching, as a lesser-included offense of aggravated statutory rape.

### *Sentencing*

At a sentencing hearing, the State offered into evidence Defendant's presentence report, the Strong R assessment, Defendant's psychosexual assessment, and letters from the victim and Ms. Polk.

The victim testified about the effects of Defendant's conduct on her life. She stated that it had affected her mentally, describing it as a "burden" that she had "carried around for years." She stated, "At one point I was very trusting and open to people. Now I am not." The victim requested that Defendant be placed on the sex offender registry in order to prevent him from harming other children.

Ms. Polk testified that the offense had affected her whole family. She said, "We went through a lot of depression because of this. From watching my child go from a happy, bubbly young girl to going to someone that doesn't really speak, doesn't want to be around crowds." Ms. Polk said that the victim had suffered from anxiety and had not wanted to leave her room. Ms. Polk testified that it was important that everyone knew "what type of person, what type of man" Defendant was because it would "keep other young girls from suffering at his hands."

Montheria Allen, Defendant's sister, testified that she had five children ranging in age from one to twenty-one years' old. Ms. Allen stated that, despite Defendant's

conviction for the instant offenses, she believed that he was not a danger to the community and that she still trusted Defendant with her children. She said that Defendant did not use drugs or alcohol, that he maintained a job, and that he took care of his children. Ms. Allen stated that she would support Defendant in complying with the court's orders. On cross-examination, Ms. Allen testified that Defendant did not tell her that he was arrested for assault for "forcibly kissing" an Uber driver while the instant case was pending but that she found out about the arrest from another family member.

Defendant testified that he was requesting judicial diversion for his offenses and that he wanted to "put it all behind [him]." He agreed that he participated in the presentence report and the psychosexual evaluation and that he was willing to participate in therapy if ordered by the court. Regarding therapy, Defendant stated, "[M]aybe I'm there to help somebody else out. But as far as me going to like a therapist or something, I don't think it's for me[,]" and he maintained that he did not commit the instant offenses. When asked if he wanted to say anything to the court or the victim, Defendant responded:

> I'm . . . like, mentally drained. You know, the false stories[.]
>
> . . . .
>
> [W]hat I've been hearing what happened that didn't happen. Just everything, you know, being on the job for a long time, losing it, not really being able to just get out like I want to get out and just having my life on hold as well.

Defendant explained that he had to change jobs four times in four years because he was placed on the sex offender registry. Defendant denied telling his current employer at PrimeCare Transport that the instant charges had been dismissed. He also denied that he forcibly kissed an Uber driver.

At the conclusion of the hearing, the trial court stated that it "will not and ha[s] not and . . . cannot" deny judicial diversion based on Defendant's refusal to admit guilt. The court stated that it considered the *Parker* and *Electroplating* factors. Regarding Defendant's amenability to correction, the trial court found that, at his trial and sentencing hearing, Defendant displayed a "general attitude" of resentment and that he was "[s]omewhat antagonistic to the system." The court noted findings from the psychosexual evaluation that Defendant had difficulty with "self-regulation" that could contribute to him re-offending. The court stated that it was concerned that Defendant was "resistant to correction." Next, the trial court found that the circumstances of the offense were "slightly aggravated" based on Defendant's authority over the victim while she was in his home that night. The court noted that factors in Defendant's favor included that he had no criminal

record and that his social history and physical and mental health were good. Regarding deterrence, the court stated:

> But as far as deterrence value to [Defendant] and his deniability is some concern is that if he has a record of this, he's less likely to be employed in positions or be in positions or be allowed legally to be in positions with small children where he could re-offend and that would deter to some extent.

Finally, the trial court considered whether diversion would serve the interest of the public as well as Defendant and concluded that "the public has a really good interest in not having him diverted." The court continued:

> And I underlined the part which said the office manager where he works at PrimeCare Transport Holly Graham office manager verified [D]efendant was employed. She was advised of [D]efendant's conviction for sexual battery and solicitation of a minor. In other words the presentence person advised her of that.

> Ms. Graham advised [D]efendant had told them the charges had been dismissed. And that's a concern to me.

The trial court stated that it had "no faith at all in [Defendant's] credibility." The court found that Defendant was not truthful when testifying at trial and at the sentencing hearing and stated, "[T]hat causes me concern because if he will lie, he may re-offend." It stated, "I just believe that to protect the interest of the public, we must have this on his record and that he must register as a sex offender." Based on those considerations, the trial court denied Defendant's request for judicial diversion.

The trial court imposed concurrent sentences of one year for solicitation of a minor, one year for sexual battery, and three months for assault by offensive touching. The court suspended Defendant's sentence to three years' supervised probation.

Defendant filed a timely motion for new trial and an amended motion for new trial. Following a hearing, the trial court denied the motion in a written order. This timely appeal follows.

## Analysis

### *Sufficiency of the evidence*

On appeal, Defendant challenges the sufficiency of the evidence as it relates to his conviction for sexual battery, asserting that the State failed to show that the sexual contact with the victim was accompanied by "force or coercion" as charged in the indictment. Defendant contends that that the victim "apparently consented" to the sexual contact with him based upon her later dancing in front of him in her underwear. Defendant asserts that the only "force" used was "just that for him to come into physical contact with [the victim]." The State responds that the evidence was sufficient to sustain Defendant's conviction for sexual battery.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

As charged in this case, sexual battery is "unlawful sexual contact with a victim by the defendant or the defendant by the victim" when "*force or coercion is used to accomplish the act*[.]" Tenn. Code Ann. § 39-13-505(a)(1) (2016) (emphasis added). "Sexual contact" includes "the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]" Tenn. Code Ann. § 39-13-501(6) (2016). Further, "intimate parts" includes "the primary genital area, groin, [or] inner thigh[.]" Tenn. Code Ann. § 39-13-501(2) (2016). Force "means compulsion

by the use of physical power or violence and shall be broadly construed to accomplish the purposes of this title[.]" Tenn. Code Ann. § 39-11-106(12) (2016).

Regarding the count of sexual battery as elected by the State, the victim testified that she was sitting beside Defendant when he asked her if she knew how to "grind[,]" to which the victim responded, "No. I don't do that." The victim testified that Defendant then grabbed her pillow, put it over her face, and pushed her back to the floor. She said that Defendant opened her legs and began "grinding against [her]," rubbing his penis against her vagina through their clothes. Later that day, the victim told Ms. Chalmers and her mother that Defendant had "violated her," and she reported the offense to police several days later. Ms. Chalmers testified that the victim seemed embarrassed and scared after the incident, and the victim's mother said that the victim was crying and initially could not speak to her about the offense. When viewed in the light most favorable to the State, the evidence supports a finding that Defendant used force to accomplish the sexual contact with the victim.

Moreover, as noted by the State in its brief, the State did not charge Defendant with sexual battery under the theory that the victim did not consent to the sexual contact and Defendant knew or had reason to know that the victim did not consent, *see* Tenn. Code Ann. 39-15-505(a)(2) (2016). Nevertheless, the record is replete with evidence that the victim did not consent to sexual contact with Defendant. The victim testified that she said no when Defendant asked her to change in front of him, when he asked her to dance in her underwear, when he asked her for oral sex, when he asked her whether he could perform oral sex on her, and when Defendant said, "I want to F you[.]" The victim also testified that she sat down several times and tried to pull away or separate herself from Defendant. Thus, Defendant knew or had reason to know that the victim did not consent to sexual contact with him, and his claim that he did not use force because she consented to the contact is unavailing. Defendant is not entitled to relief.

### *Denial of judicial diversion*

Defendant next contends that trial court abused its discretion by denying judicial diversion. The State responds that the trial court properly denied Defendant's request for diversion.

Upon a finding of guilt, the trial court may defer further proceedings and place a qualified defendant on probation without entering a judgment of conviction. Tenn. Code Ann. § 40-35-313(a)(1)(A) (2020). Once a defendant who is placed on diversion successfully completes probation, the charge will be dismissed. Tenn. Code Ann. § 40-35-313(a)(2) (2020). A "qualified defendant" is a defendant who:

(a) [i]s found guilty of or pleads guilty or nolo contendere to the offense for which deferral of further proceedings is sought;

(b) [i]s not seeking deferral of further proceedings for any offense committed by any elected or appointed person in the executive, legislative or judicial branch of the state or any political subdivision of the state, which offense was committed in the person's official capacity or involved in the duties of the person's office;

(c) [i]s not seeking deferral of further proceedings for a sexual offense, a violation of § 39-15-502, § 39-15-508, § 39-15-511, or § 39-15-512, driving under the influence of an intoxicant as prohibited by § 55-10-401, vehicular assault under § 39-13-106 prior to service of the minimum sentence required by § 39-13-106, or a Class A or B felony;

(d) [h]as not previously been convicted of a felony or a Class A misdemeanor for which a sentence of confinement is served; and

(e) [h]as not previously been granted judicial diversion under this chapter or pretrial diversion.

Tenn. Code Ann. § 40-35-313(a)(1)(B)(i) (2020).  The offenses for which Defendant was convicted are not in the list of sexual offenses which would disqualify a defendant from judicial diversion.  *See* Tenn. Code Ann. § 40-35-313(a)(1)(B)(ii) (2020).

Judicial diversion is a form of "legislative largess."  *State v. Schindler*, 986 S.W.2d 209, 211 (Tenn. 1999).  Being qualified for diversion under the statute does not entitle a defendant to judicial diversion; instead, the decision whether to grant judicial diversion is left to the trial court's discretion.  *State v. King*, 432 S.W.3d 316, 323 (Tenn. 2014).  The defendant bears the burden of proving that he or she is a suitable candidate for judicial diversion.  *State v. Faith Renea Irwin Gibson*, No. E2007-01990-CCA-R3-CD, 2009 WL 1034770, at *4 (Tenn. Crim. App. Apr. 17, 2009) (citing *State v. Curry*, 988 S.W.2d 153, 157 (Tenn. 1999); *State v. Baxter*, 868 S.W.2d 679, 681 (Tenn. Crim. App. 1993)).

When determining whether to grant judicial diversion to a qualified defendant, the trial court must consider the following factors:

(a) the accused's amenability to correction; (b) the circumstances of the offense; (c) the accused's criminal record; (d) the accused's social history; (e) the accused's physical and mental health; (f) the deterrence value to the

- 13 -

accused as well as others; and (g) whether judicial diversion will serve the interests of the public as well as the accused.

*State v. Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). In addition to the *Parker* and *Electroplating* factors, the trial court may consider the following factors in making its decision: the defendant's "attitude, behavior since arrest, prior record, home environment, current drug usage, emotional stability, past employment, general reputation, marital stability, family responsibility[,] and attitude of law enforcement." *State v. Anthony Adinolfi*, No. E2013-01286-CCA-R3-CD, 2014 WL 2532335, at *2 (Tenn. Crim. App. June 2, 2014) (quoting *State v. Washington*, 866 S.W.2d 950, 951 (Tenn. 1993)) (internal quotation marks omitted). The record must reflect that the trial court weighed all the *Parker* and *Electroplating* factors against each other, and the trial court must give an explanation of its ruling on the record. *King*, 432 S.W.3d at 326; *Electroplating*, 990 S.W.2d at 229. A defendant's "continued denial of guilt should not, in and of itself, preclude judicial diversion." *State v. Lewis*, 978 S.W.2d 558, 567 (Tenn. Crim. App. 1997).

We review a trial court's decision regarding judicial diversion under the same standard set forth in *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012). *King*, 432 S.W.3d at 324. If the trial court considers the *Parker* and *Electroplating* factors, specifically identifies the relevant factors, and places on the record its reasoning for granting or denying judicial diversion, then "the appellate court must apply a presumption of reasonableness and uphold the grant or denial so long as there is any substantial evidence to support the trial court's decision." *Id.* at 327. The trial court need not recite all the *Parker* and *Electroplating* factors when justifying its decision on the record in order to be granted a presumption of reasonableness. *Id.* However, the record should reflect that the trial court considered the factors when rendering its decision and that it identified the relevant factors applicable to the case. *Id.* Once the trial court identifies the relevant factors, it may proceed solely on those. *Id.*

Here, the trial court clearly considered the *Parker* and *Electroplating* factors, identified the relevant factors it applied to support its decision to deny Defendant's request for judicial diversion, and expressly explained its reasoning. Thus, the trial court's decision is entitled to a presumption of reasonableness.

Defendant asserts that the trial court denied diversion based on his refusal to admit guilt. However, the trial court specifically stated that it "will not and ha[s] not and . . . cannot" deny diversion based on Defendant's refusal to admit guilt, citing *Lewis*, and our reading of the trial court's findings do not indicate that the court required such. Rather, it appears that the trial court was considering Defendant's denials in terms of credibility, a

factor which is properly considered. *State v. Anderson*, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992) (upholding denial of judicial diversion on the basis of untruthfulness); *see also State v. Dowdy*, 894 S.W.2d 301, 305 (Tenn. Crim. App. 1994) (concluding that consideration of a defendant's candor while testifying was probative of prospects for rehabilitation). The trial court noted that Defendant's dishonesty towards his employer, during trial, and during the sentencing hearing weighed against his amenability to correction. The court also found that Defendant displayed a "general attitude" of resentment and that he was "[s]omewhat antagonistic to the system."

The trial court additionally found that the circumstances of the offense were "slightly aggravated" based on Defendant's authority over the victim while she was in his home that night and weighed against diversion. The evidence in the record supports this determination. On the weekend of the offense, the victim's mother was out of the state, and the victim and her sister were staying with Defendant and Ms. Donegan at their apartment. The victim's mother and Ms. Donegan both trusted Defendant, who was twice the victim's age, to help watch and care for the children in the apartment. The victim had reason to trust that she would be safe there because Ms. Stanfield had stayed with them safely several times before, but Defendant broke that trust.

The trial court further found that the deterrence value of diversion and whether diversion would serve the ends of justice both weighed against granting diversion. The court noted findings from the psychosexual evaluation that Defendant had difficulty with "self-regulation" that could contribute to him re-offending. The court further noted that Defendant had lied to his employer about the outcome of the case and stated that it had "no faith at all in [Defendant's] credibility." The court stated, "[T]hat causes me concern because if he will lie, he may re-offend." Based on Defendant's risk of re-offending, the trial court found that "the public ha[d] a really good interest in not having him diverted" and reasoned that, if the record of his criminal convictions remained, Defendant would be less likely to be employed in positions with children where he could re-offend.

Upon review, we conclude that there is substantial evidence in the record to support the trial court's denial of judicial diversion and that the trial court did not abuse its discretion. Defendant is not entitled to relief.

## Conclusion

Based on the foregoing reasons, we affirm the judgments of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 15 -